IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| METRO AUTO SALES, INC. | : CIVIL ACTION |
| | : |
| vs. | : |
| | : NO. 14-6530 |
| THE REYNOLDS AND REYNOLDS COMPANY | : |
| | : |

**KEARNEY, J.**                                                                                                              **July 21, 2015**

## MEMORANDUM

An auto dealership plaintiff hoping to change its computer services provider remains governed by its contract with its current provider until transition. After signing a contract which did not require good faith transition efforts, the dealership sued to compel the defendant computer services provider to engage in good faith transition including returning its data. The parties' contract is a myriad of obligations in at least three different documents and a password-protected website which are fully incorporated and governed by Ohio law. One of the incorporated documents includes an agreement to arbitrate their certain claims through the American Arbitration Association ("AAA") in Defendant's home state of Ohio. After discovery necessitated by several questions on assent to arbitration and scope of any assent, and not finding any genuine issues of material fact, we grant Defendant's motion to compel arbitration in the accompanying Order.

## I.     Factual Background[1]

Plaintiff Metro Auto Sales, Inc., ("Metro") is a New Jersey corporation doing business under the name Value Kia, which sells cars in Philadelphia. (Am.Comp. at ¶¶ 1, 3-4). Defendant The Reynolds and Reynolds Company ("Reynolds") is an Ohio corporation with its headquarters in Kettering, Ohio. (*Id.* at ¶ 2). Reynolds provides automobile dealership software, business forms, supplies, and professional services to its customers. (*Id.* at ¶ 5).

### a.   Controlling documents – Exhibits, Master Agreements, and Customer Guides

Reynolds and Metro began their relationship on January 8, 2001, through an agreement for Reynolds to supply hardware, software and support services to Metro ("2001 Order") (App. 67a-73a). The 2001 Order, referred to as an "Exhibit," incorporates the terms and conditions of a Master Agreement and the then-current Customer Guide, which included the terms and conditions in the Exhibit and Reynolds' policies located at its website. The 2001 Order states:

> "This Exhibit incorporates all the terms of the Master Agreement and the terms and conditions of the then-current Customer guide, which includes the terms and conditions included in this Exhibit and Reynolds' applicable policies at http://www.reyrey.com. You understand that Reynolds will not accept any order from you unless you have signed and Reynolds has accepted a Master Agreement. If a Master Agreement is not in effect and

---

[1]     After removing this action, Reynolds moved to dismiss Metro's Amended Complaint ("Am. Comp") based on an arbitration provision. (ECF Doc. No. 3). In our March 2, 2015 Order, we directed the parties to engage in limited discovery on the arbitrability issue, with Reynolds permitted to renew its motion to compel arbitration. (ECF Doc. No. 8). On May 22, 2015, Reynolds filed its renewed Motion to Compel Arbitration and Motion for Summary Judgment. (ECF Doc. No. 23). The Court's Policies require a Statement of Undisputed Material Facts ("SUF") in support of a summary judgment motion. Reynolds filed its Statement of Undisputed Material Facts at ECF Doc. No. 23-1 ("DSUF"), and Metro's Response to Reynolds' Statement of Undisputed Facts is filed at ECF Doc. 30-1 ("PRSUF"). The party moving for summary judgment must also submit an appendix of exhibits or affidavits. Reynolds' Appendix is filed at ECF Doc. Nos. 23-5 through 23-11. Metro submitted additional materials for the Appendix at ECF Doc. Nos. 30-3 through 30-27 (corrected). References to the Appendix in this opinion shall be referred to as "App." followed by the Bates number.

>Reynolds accepts your order under this Exhibit, your order will be considered to consist of the accepted Exhibit and the terms of the Master Agreement and no other terms will apply . . ."

(App. 67a).

For over twelve years, from 2001 to 2014, the parties executed fifteen Orders - or "Exhibits" – through which Metro ordered hardware, software, and related services from Reynolds. (App. 67a, 74a-76a, 77a-79a, 85a, 87a-88a, 90a, 92a, 94a, 97a, 100a). Each of the Exhibits incorporated the terms of the Master Agreement and Customer Guide. (*Id.*) (SUF at ¶3; PRSUF at ¶3).

In December 2003, Metro signed an "Authorization Letter" ("2003 Authorization Letter") agreeing "Items and Services will be provided . . . pursuant to this Authorization Letter, the Master Agreement, the then-current Customer Guide (which we may change periodically) and the Exhibit applicable to the Items and Services." (App. 1a). The 2003 Authorization Letter incorporated, *inter alia,* the Master Agreement, Customer Guide, and Exhibit (collectively, "Documents"); provided all "Capitalized Terms" used in the Authorization Letter and Documents are defined in the "Defined Terms" section; and referred Metro to Reynolds' website for copies of the Documents. (*Id.*) Metro agreed "to the use of electronic means of transmitting and accepting Orders, and that [it] will follow all rules for electronic contracting set forth in the Documents." (*Id.*)[2]

---

[2] The 2003 Authorization Letter provides, in part:

>The purpose of this "Authorization Letter" is to agree upon how You and [Reynolds] will conduct business. By signing this Authorization Letter, You are agreeing that Items and Services will be provided for Your use pursuant to this Authorization Letter, the Master Agreement, the then-current Customer Guide (which we may change periodically) and the Exhibit applicable to the Items and Services. . . . Capitalized terms used in this Authorization Letter, the Master Agreement, Customer Guide, Exhibit/Lease Schedule and Master Lease

3

Metro executed a second Authorization Letter on September 9, 2009 ("2009 Authorization Letter"). (App. 2a). The 2009 Authorization Letter contains language nearly identical to the 2003 Authorization Letter. (*Id.*)

There are four Master Agreements between the parties stating:

> The Authorization Letter, this Master Agreement (which includes all properly executed written addendums to this Agreement), the Defined Terms, the then-current Customer Guide, and the Exhibit(s) form Reynolds' relationship with you, the Customer. . . .

(App. 3a).

All Master Agreements contain the same language, "[d]isputes will be resolved as provided in the Customer Guide."[3] (App. 3a; 549a). Paragraph 7(h) of the Master Agreement contains a choice of law provision, applying the law of Ohio:

> "This Agreement shall be governed by and construed in accordance with the internal laws of the State of Ohio, without regard to its principles of conflict of laws. You consent to jurisdiction by the state and federal courts sitting in the State of Ohio. . . ."

---

Agreement are defined in the Defined Terms (all these documents are collectively the "Documents"). These Documents can be found at http://www.reyrey.com the Documents are specifically incorporated by reference into this Authorization Letter and made apart hereof. For Your convenience, we are attaching copies of the Master Agreement, Master Lease Agreement and Defined Terms to this Authorization Letter.

. . .

You and the individual signing below agree, represent and warrant that: . . . (4) You have read this Authorization Letter (and Documents incorporated by reference) and Customer will be bound by all terms and conditions described therein, as signified by Your signature below;

(App. 1a).

[3]  Paragraph 7 of the Master Agreement "Version 3," the most recent version of the Master Agreement, provides, *inter alia*: "(a) Disputes will be resolved as provided in the Customer Guide." (App. 4a; 549a). *See also* Master Agreements at App. 542a-43a; 544a-45a; 546a-47a.

(App. 4a).[4]

The Master Agreement additionally contains "Defined Terms" including:

> "Customer Guide: the Reynolds Customer Guide, which we may periodically modify, amend, and/or supplement as described in the "General" section of the Customer Guide."
>
> "Exhibit: any Reynolds exhibit specifying Items and/or Services. The Exhibit becomes part of an Order when it has been signed by us."
>
> "Order: the Master Agreement and/or an Exhibit that has been accepted by us."

(App. 5a-6a).

There are nine Customer Guides between the parties. (App. 162a-482a). The most recent version of the Customer Guide, dated January 1, 2009, contains "General Policies" which incorporate the Customer Guide into the Authorization Letter and Master Agreement.[5]

---

[4] The parties agree Ohio provides the governing law although a fair question could be raised as to Pennsylvania law. *See Morina v. Neiman Marcus Group, Inc.*, No. 14-1394, 2014 WL 4933022, *9-11 (E.D.Pa. Oct. 1, 2014)

[5] The "General Policies" section of the Customer Guide provides, *inter alia*:

> **General**. This Customer Guide is incorporated into the Authorization Letter and Master Agreement. Capitalized terms are either defined herein or in Defined Terms, found at https://my.reyrey.com. This Customer Guide describes policies that apply to the Items and Services that you acquire form us. We may, from time to time, update, amend and supplement this Customer Guide. Such changes will be effective on the date the Customer Guide change is posted on this Web site. These changes typically describe the terms and conditions under which we offer new Items and Services. We will try not to make any change to the Customer Guide that materially diminishes your rights hereunder.
>
> If Reynolds makes any change to the Customer Guide that you believe affects you in a materially adverse manner, you may promptly notify Reynolds in writing specifying the nature of your complaint. You and Reynolds will work in good faith to resolve your complaint. If after sixty (60) days you and Reynolds are unable to resolve your complaint, then, at Reynolds' option, you will either receive the affected Item under our previously stated policies or we will permit you to discontinue the affected Item. You shall pay all amounts incurred and

The Customer Guide contains a "Disputes" provision which states, in part:

> "Any disputes between us related directly or indirectly to an Order will be settled by binding arbitration (except for disputes involving your failure to pay amounts due to us or violation of any proprietary rights of Other Providers of us) under the American Arbitration Association Rules except as specifically stated herein. It does not matter whether the controversy is based on contract, tort, strict liability, or other legal theory. . . . The arbitration will be held in Dayton, Ohio.
>
> . . .
>
> The Federal Arbitration Act, 9 U.S.C. Sections 115, not state law, will govern the ability to arbitrate any and all claims and all aspects of any arbitration. . . ."

(App. 17a; 492a).

### b. Metro seeks to discontinue its business relationship with Reynolds, and the dispute between the parties.

In 2012, Metro began negotiating with Reynolds to install a new document scanning system. (Am.Comp. at ¶ 8). Around the same time, Metro prepared to relocate its car dealership. (*Id.* at ¶ 9.) On February 27, 2013, Reynolds proposed a document scanning system which Metro rejected. (*Id.* at ¶¶ 10-11.) Reynolds made another proposal in October 2013 which Metro again rejected. (*Id.* at ¶¶ 21-22.) Metro began negotiating with Automatic Data Processing, Inc. ("ADP") for services and requested Reynolds release all of Metro's data to ADP to transition services. (*Id.* at ¶¶ 24-25.) Reynolds refused to release Metro's data. (*Id.* ¶¶ 26, 27.) Metro stopped paying Reynolds, which in turn "shut down" Metro's system on three occasions: November 2013, 2014 nd April and May 2014. (*Id.* at ¶¶ 27-30.)

---

> remain otherwise fully obligated for such Item, Licensed Matter, or Services up through the effective date of such discontinuance. This is your only remedy and our only obligation for modifications to the Customer Guide.

(App. 7a-66a; App. 482a-541a).

On June 20, 2014, Metro filed an Amended Complaint in the Philadelphia County Court of Common Pleas. Defendant removed the case to this Court. Metro's two-count complaint seeks damages for breach of contract and equitable relief in the form of specific performance, asking this Court to order Reynolds to (a) turn over its data and (b) continue to perform its services uninterrupted until it has been replaced. (*Id.* at ¶¶ 33-35, 36-41.)[6]

## II. *Standard of Review for a motion to compel arbitration*

The Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA"), evidences Congress' strong policy in favor of arbitration. *See KPMG LLP v. Cocchi*, ___U.S.___, 132 S.Ct. 23, 25 (2011) (*per curiam*) ("Federal Arbitration Act reflects an 'emphatic federal policy in favor of arbitral dispute resolution'") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 4 73 U.S. 614, 631 (1985)); *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (Section 2 of the FAA "'declare[s] a national policy favoring arbitration' of claims that parties contract to settle in that manner" (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)). Section 2 of the FAA provides arbitration agreements "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.[7]

---

[6] At oral argument, Reynolds represented it continues to provide Metro with services notwithstanding Metro stopping payments to Reynolds. Metro explained its claim for equitable relief rests on its desire to switch to another top-tier services company, ADP. Metro alleged Reynolds shut down its service when an ADP worker inspected the Reynolds' system at Metro. Metro seeks to force Reynolds to turnover Metro's data, which, under the Master Agreement, belongs to Metro as Reynolds' customer. Metro argued we must intervene to force Reynolds to turn over the data and facilitate Metro's transition to ADP, its new service provider. In response, Reynolds argued it is not contractually obligated to help Metro with this transition.

[7] 9 U.S.C. § 2 provides:

> "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or

7

"For a court to compel arbitration, it initially must find that there is a valid agreement to arbitration because the basis for contractual arbitration is consent, not coercion." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995)). "[I]n deciding whether a party may be compelled to arbitrate under the [FAA], we first consider (1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement." *Sanford v. Bracewell & Guiliani, LLP*, No. 14-1763, 2015 WL 4035614, at *2 (3d Cir. July 2, 2015) (citing *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir.2014) (internal quotation marks omitted)).

The decision of our Court of Appeals in *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764 (3d Cir. 2013) sets the standard applied to motions to compel arbitration. Where, as here, a court finds the "complaint and its supporting documents are unclear regarding the agreement to arbitrate . . . the parties should be entitled to discovery on the question or arbitrability before a court entertains further briefing on the question." *Id.* at 776. After discovery, the court reviews a renewed motion to compel arbitration under the summary judgment standard. *Id.* "In the event that summary judgment is not warranted because 'the party opposing arbitration can demonstrate, by means of citations to the record,' that there is 'a genuine dispute as to the enforceability of the arbitration clause,' the 'court may then proceed summarily to a trial regarding the making of the arbitration agreement or the failure, neglect, or refusal to perform the same,' as Section 4 of the FAA envisions." *Id.* at 776 (citation omitted) (internal quotes omitted).

---

> any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

Reynolds initially moved to dismiss Metro's Amended Complaint based on an arbitration provision in the contract between the parties. Our March 2, 2015 Order, applying *Guidotti*, denied Reynolds' motion to dismiss without prejudice to renew after limited discovery on the arbitrability issue. (ECF Doc. No. 8). After the completion of discovery, Reynolds filed a Motion to Compel Arbitration and Motion for Summary Judgment on May 22, 2015. As directed by *Guidotti*, we apply the summary judgment standard to Reynolds' motion.[8]

---

[8] Reynolds argues we should apply the motion to dismiss standard to its renewed motion to compel arbitration (ECF Doc. No. 23) instead of the motion for summary judgment standard even after the parties' discovery on the arbitration issue. Reynolds cites *Sanford v. Bracewell & Giuliani, LLP*, 6 F.Supp. 3d 568 (E.D. Pa. 2014) where the district court, after holding three evidentiary hearings on the enforceability of an arbitration clause, applied the 12(b)(6) standard to the claims of the plaintiff husband and the summary judgment standard to the claims of the plaintiff wife against the defendant law firm. Applying the summary judgment standard, the district court considered evidence outside the face of the complaint and found a genuine issue of material fact existed as to whether the plaintiff wife was a client of the law firm and bound by an arbitration provision. *Id.* at 587. Since Reynolds filed its renewed motion on May 22, 2015, our Court of Appeals reversed the district court's ruling in *Sanford* relating to the standard applied to plaintiff wife. *Sanford v. Bracewell & Guiliani, LLP*, No. 14-1763, 2015 WL 4035614 (3d Cir. July 2, 2015). Applying *Guidotti*, the Court of Appeals found, on the face of the complaint, plaintiff wife sued for breach of a written engagement agreement which contained an arbitration clause. *Id.* at *3. "Because 'the affirmative defense of arbitrability' was therefore apparent from the face of the complaint and the documents relied upon therein, . . . the motion should have been reviewed under Rule 12(b)(6) . . . ." *Id.* (citing *Guidotti*). Applying the principles of equitable estoppel, the Court of Appeals found plaintiff wife asserted a breach of contract claim based on the engagement agreement and must be bound by the arbitration provision contained in it. *Id.*

To the extent Reynolds cites *Sanford* – and presumably could cite to the Court of Appeals' decision as support for its argument for the application of the 12(b)(6) standard – we find it distinguishable. Here, an arbitration provision is not apparent on the face of Metro's Amended Complaint. Metro did not attach the contract upon which it bases its Complaint and Amended Complaint. When it filed its motion to dismiss, Reynolds attached the January 8, 2001 "Exhibit" incorporating the Master Agreement and Customer Guide, and attached an Authorization Letter, Master Agreement, and Customer Guide. (ECF Doc. No. 3). We ordered limited discovery on arbitrability because of questions raised by Metro in its opposition to Reynolds' motion to dismiss (ECF Doc. No. 4) regarding, *inter alia*, multiple documents incorporating by reference other documents, whether those documents incorporated an arbitration agreement, whether Metro signed any document with an arbitration provision, and whether Metro was ever provided a copy of the document containing an arbitration provision, as well as fact questions raised in Reynolds' reply brief (ECF Doc. No. 6). On these facts – and

9

## III. Analysis

Reynolds moves to compel arbitration under the summary judgment standard arguing (1) a valid agreement to arbitrate exists between the parties and (2) Metro's claims for breach of contract and specific performance fall within the scope of the arbitration agreement. In response, Metro argues the arbitration provision is not properly incorporated in the parties' agreement, enforcement of the arbitration clause would be unconscionable, and the parties' dispute does not come within the arbitration provision.[9] We address these issues *seriatim*.

### A. There is a valid and enforceable arbitration clause.

#### 1. *The arbitration clause is properly incorporated.*

The parties entered into a business relationship beginning in 2001 when Metro first engaged Reynolds. (App. 67a). The record reflects multiple "orders," or "Exhibits," over a 12-year period. There is no dispute Metro and Reynolds entered into two Authorization Letters, the most recent dated 2009.[10] (App. 2a). The purpose of the 2009 Authorization Letter, like the 2003

---

unlike *Sanford* - we find the arbitrability of the claims here is not apparent on the face of the complaint. Rather, we find the Metro's Amended Complaint and the documents attached by Reynolds "are unclear regarding the agreement to arbitrate," and, accordingly, apply the summary judgment standard. *Guidoitti*, 716 F.3d at 776.

[9] We apply federal law to determine "whether an issue governed by the FAA is referable to arbitration." *Gay v. Creditinform*, 511 F.3d 369, 388 (3d Cir. 2007) (citation omitted). Based on the parties' agreement, we apply Ohio law to the contractual defenses such as unconsionability. *Id.* See also *Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191, 200 (3d Cir. 2010).

[10] The 2009 Authorization Letter provides in part:

> The purpose of this "Authorization Letter" is to agree upon how You and The Reynolds Company ("Reynolds") will conduct business. ***By signing this Authorization Letter, You are agreeing that Items and Services will be provided for Your use pursuant to this Authorization Letter and the current Master Agreement.*** . . . This Authorization Letter, and the various Master Agreement and Master Lease Agreement documents are defined in the Defined Terms (all these documents are collectively referred to as the "Documents"). ***These Documents can be found at https://my.reyrey.com. These Documents are***

10

Authorization Letter, "is to agree on how [Metro] and [Reynolds] will conduct business." (*Id.*) Although there are multiple levels to reach the arbitration provision, the record reflects:

- By signing the 2009 Authorization Letter, Metro "agree[d] that Items and Services will be provided for [its] use pursuant to this Authorization Letter, the Master Agreement, the then-current Customer Guide (which may change periodically) and the Exhibit applicable to the Items and Services." (App. 1a);

- The 2009 Authorization Letter, signed by Metro's President, incorporates by reference the Master Agreement. (App. 2a).

- The Master Agreement provides "disputes will be resolved as provided in the Customer Guide." (App. 4a).

- The Customer Guide contains the arbitration provision requiring "any disputes between [the parties] related directly or indirectly to an Order will be settled by binding arbitration . . ." under the AAA rules, to be held in Dayton, Ohio. (App. 17a; 492a);

- The Customer Guide is incorporated into the Authorization Letter and Master Agreement. (App. 10a).

Under Ohio law, "separate agreements may be incorporated by reference into a signed contract," and "when a document is incorporated into another by reference, both instruments must be read and construed together." *Keybank Nat'l Assoc. v. Southwest Greens of Ohio, L.L.C.*, 988 N.E.2d 32, 39 (Ohio Ct. App. 2013); *see also Mohmed v. Certified Oil Corp.*, No. 102049,

---

> ***specifically incorporated by reference into this Authorization Letter and made a part hereof.*** For Your convenience, we are attaching to this Authorization Letter copies of the Master Agreement document, the MLA (if applicable), and the Defined Terms. . . .
>
> You and the individual signing below agree, represent, and warrant that: . . . (4) ***You have read this Authorization Letter (and Documents incorporated by reference) and Customer will be bound by all terms and conditions described therein***, as signified by Your representative's signature below; . . .

(App. 2a) (emphasis added).

2015 WL 3819201, * 6 (Ohio Ct. App. June 18, 2015) (plaintiff bound by terms of unsigned addendum expressly incorporated by reference into signed supply agreement).

Metro does not deny it signed the 2009 Authorization Letter; it argues the arbitration provision is not incorporated because it is "behind a firewall and dead links." Metro cites two Ohio cases, *New Page Corp. v. Mayfield Creek Forestry Consultants, LLC*, No. 14-386, 2014 WL 7366201 (S.D. Ohio Dec. 24, 2014) and *Discount Drug Mart, Inc. v. Devos, Ltd.*, No. 12-386, 2013 WL 5820044 (N.D. Ohio Oct. 29, 2013). Metro additionally cites testimony of its President admitting she had, at one time, a password to use the Reynolds system, but currently cannot log on to Reynolds' system. (App. 120a; N.T. A. Shtutman 6:2-16).

The *New Page* case supports a finding the arbitration provision is incorporated. The court found a forum selection clause in a "terms and conditions" section on a website expressly incorporated by reference in a purchase order. *New Page*, 2014 WL 7366201 at *3.[11] The court in *New Page* distinguished the *Discount Drug Mart* case, on which Metro relies. In *Discount Drug Mart*, the court found "terms and conditions" on a website were not incorporated into a contract because the plaintiff retained the power to unilaterally modify the contract, and "could clearly result in surprise or hardship." *Discount Drug Mart*, 2013 WL 5820044 at *2.

The facts here are distinguishable. Metro is admittedly not surprised by the agreement to arbitrate. Here, the Master Agreement and Defined terms are properly incorporated in the 2009 Authorization Letters. Similar to *New Page*, where the court accepted language referencing a separate document's location on a website, here, the Authorization Letter "clearly and

---

[11]   In *New Page*, the main document stated, "acceptance of this order . . . is expressly limited to the most recent NewPage Terms & Conditions dated 5/01/05 which can be found on www.newpagecorp.com." *New Page*, 2014 WL 7366201 at *2. Although the party contesting the forum selection clause was not provided a hard copy of the incorporated document, the District Court held the language properly incorporated the website because the language is "plain, clear, and conspicuous." *Id.* at *2-*3.

unequivocally" references the location of the Master Agreement at http://my.reyrey.com and instructs Metro to read the Authorization Letter "and documents incorporated by reference" before signing.[12]

The Master Agreement "clearly and unequivocally" incorporates the Customer Guide. The first sentence of the Master Agreement states, "The Authorization Letter, this Master Agreement (which includes all properly executed written addendums to this Agreement), the Defined Terms, the then-current Customer Guide, and the Exhibit(s) form Reynolds' relationship with you." Although the Customer Guide is not expressly mentioned in the 2009 Authorization Letter, the Customer Guide is mentioned in the first sentence of the Master Agreement and is defined in the "Defined Terms," both of which are properly incorporated.[13] In addition, the Master Agreement addresses dispute resolution. Since these documents are properly incorporated, the Customer Guide's provisions, including the arbitration clause, are given full effect.

---

[12] In 2003, Reynolds' website was http://www.reyrey.com. In 2009, the website link changed to https://my.reyrey.com. Accessing both of these websites requires a username and password, which is provided to Metro from Reynolds. If Metro does not access the website within 30 days, Metro must contact Reynolds for new log-in information.

[13] The Master Agreement provides: "any initial demand for legal action or arbitration pursuant to this Agreement, and any legal action arising under this Agreement, must be initiated within one year after the cause of action arises." The Master Agreement also provides in Section 7, "Disputes will be resolved as provided in the Customer Guide."

The Defined Terms provides: <u>Customer Guide</u>: the Reynolds Customer Guide, which we may periodically modify, amend, and/or supplement as described in the "General" section of the Customer Guide.

The Defined Terms also provides: <u>Order</u>: the Master Agreement and/or an Exhibit that has been accepted by us.

We find Angela Shtutman's and Oleg Shtutman's testimony do not create a genuine issue of fact. This testimony does not establish Reynolds prevented Metro from accessing relevant documents, or otherwise concealed documents from Metro. Metro employee Joanne Klotz testified she has a username and password. Ms. Klotz testified she accessed the "my.reyrey.com" website "usually once a year to access the end of year information" since 2001. (App. 109a-110a.) Angela Shtutman, who has a duty to read the contracts, admittedly had a password to use the website; however, she rarely logged on. (App. 123a-125a.) Metro admittedly did not review, or take steps to access, the "then-current Customer Guide" – which contains the arbitration provision – on Reynolds' website at http:www.reyrey.com. (App. 135a-136a.)

We find there is no genuine issue of material fact the arbitration provision in the Customer Guide in incorporated into the Authorization Letter and Master Agreement.[14]

### 2. *The arbitration clause is not unconscionable.*

Metro alleges enforcing the arbitration clause is unconscionable because the contract creates a "take-it-or-leave-it" scenario and Reynolds modified terms of the arbitration clause.[15]

---

[14] We give full effect to incorporated documents. Under Ohio law, each word and provision in an incorporated document is given full effect. *Christie v. GMS Mgt. Co.*, 705 N.E.2d 691, 693 (Ohio Ct. App. 1997) ("courts should attempt to harmonize provisions" of separate documents); *see also, AT&T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail"); *Keybank Nat'l Assoc.*, 998 N.E.2d at 39 ("when a document is incorporated into another by reference, both instruments must be read and construed together"); *Blanchard Valley Farmers Cooperative, Inc. v. Carl Niese & Sons Farms, Inc.*, 758 N.E.2d 1238, 1239 (Ohio Ct. App. 2001) ("documents that are incorporated by reference into a contract are to be read as though they are restated in the contract").

[15] Metro alleges the arbitration clause is unconscionable because: (1) Reynolds does not provide copies of signed documents back to Value Kia; (2) Reynolds does not maintain the terms and conditions on the website indicated in the documents, where it does maintain the terms and conditions, one needs a username and password to access it; (3) "Reynolds seeks to retain the right to change the terms and conditions of the contract at any time for any reason, and it has done so, specifically as to the arbitration clause in subtle and significant ways that are overly

Ohio law does not support Metro's claims. Although unconscionability may provide sufficient grounds to invalidate an arbitration agreement, we find Metro's argument is not compelling. *See Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 393 (6th Cir. 2003) (using state contract law to determine "whether the arbitration clause itself was validly obtained").

Under Ohio Law, an arbitration clause is unconscionable if both procedural and substantive unconscionability exist. *Bragg v. Rent-A-Ctr., Inc.*, No. 07-1389, 2008 WL 183315, at *3 (N.D. Ohio Jan. 18, 2008) (citing *Dorsey v. Contemporary Obstetrics & Gynecology, Inc.*, 113 Ohio App.3d 75, 80 (1996)). The party claiming unconscionability bears the burden to establish procedural and substantive unconscionability. *Taylor Bldg. Corp. of Am. v. Benfield*, 884 N.E.2d 12, 20 (Ohio Ct. App. 2008) (reasoning issue decided as matter of law).

Procedural unconscionability exists if one party is denied the opportunity to meaningfully agree to the contract's terms. *Bragg,* 2008 WL 183315, at *3 (reasoning terms must be too difficult to understand or there must be unequal bargaining power). "To determine whether an arbitration clause is procedurally unconscionable, courts have considered factors such as whether: 1) the arbitration clause was presented on a "take-it-or-leave-it basis;" (2) a disparity in bargaining power exists between the parties; (3) the arbitration clause was hidden in small print within the document; and (4) one of the parties could unilaterally modify the agreement." *Stachurski v. DirecTV, Inc.*, 642 F. Supp. 2d 758, 767 (N.D. Ohio 2009).[16] Failing to read an

---

generous and favorable to it and extremely detrimental to Value Kia." (Metro's opposition brief at 1, (ECF Doc. No. 30). Further, Metro cites to two changes to the arbitration clause: (1) Reynolds changed the location of the arbitration; and (2) Reynolds deleted language, which prohibited the award of counsel fees in arbitration. (*Id.*)

[16] In *Stachurski,* the court addressed the four factors holding the arbitration clause not procedurally unconscionable. *Stachurski,* 642 F.Supp. 2d at 770. The court held the arbitration clause contained in the customer agreement did not create a "take-it-or-leave-it" scenario, finding plaintiffs accepted terms of arbitration clause, even though they did not sign arbitration clause, by continuing to accept defendant's services. *Id.* at 767-68. On the second factor, the

agreement or contract containing an arbitration clause does not render the clause invalid. is not an example of procedural unconscionability. *Id.* at 765; *see also Estate of Brewer v. Dowell & Jones, Inc.*, No. 80563, 2002 WL 1454069, at *2 (Ohio Ct. App. July 3, 2002) ("party entering a contract has a responsibility to learn the terms of the contract prior to agreeing to its terms").

Substantive unconscionability exists if the terms of a contract are unfairly one sided. *Bragg*, 2008 WL 183315, at *3. "Substantive unconscionability involves those factors which relate to the *contract terms themselves* and whether *they* are commercially reasonable. Because the determination of commercial reasonableness varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability." *Dorsey v. Contemporary Obstetrics & Gynecology, Inc.*, 680 N.E.2d 240, 243 (Ohio App. Ct. 1996) (quotation omitted) (emphasis in original); *see also*, *Stachurski*, 642 F. Supp. 2d at 770 (reasoning no defined set of factors exists under Ohio law so courts must consider content of agreement).

Here, Metro alleges the contract is unconscionable because Reynolds retained the ability to unilaterally modify the contract and Reynolds created a "take-it-or-leave-it" scenario. There is no evidence to support Metro's position. The record demonstrates otherwise. The Master Agreement provides "Reynolds may change the Customer Guide from time to time with or without notice. It is your responsibility to access and view the Customer Guide at the Site, and

---

court did not find disparity in bargaining power between the parties, a factor that is satisfied where there is "some evidence that, in consequence of the imbalance, the party in the weaker position was defrauded or coerced into agreement to the arbitration clause." *Id.* at 768 (citation omitted). On the third factor, the court rejected a "hidden in small print" argument. *Id.* at 769. Finally, the court addressed the ability of the defendant to unilaterally modify the contract. Language such as "[W]e ... reserve the right to change ... the terms on which we offer Service ... You always have the right to cancel your Service, in whole or in part at any time, and you may do so if you do not accept any such changed terms or changes in programming," was found to provide plaintiffs with the opportunity to cancel defendant's services. *Id.* The court relied on plaintiffs' ability to cancel defendant's services. *Id.*

all such changes will be binding upon you." (App. 4a.) The defined terms states "the Reynolds Customer Guide, which we may periodically modify, amend, and/or supplement." (App. 5a.)

Although Reynolds altered some of the terms within the arbitration clause, Metro accepted these changes in signing the Authorization Letter. Similar to *Stachurski*, in which the court relied on the party's ability to terminate the agreement, Reynolds also provides a remedy if Metro did not agree with any changes: "If Reynolds makes any changes to the Customer Guide that you believe affects you in a materially adverse manner, you may promptly notify Reynolds in writing specifying the nature of your complaint . . . This is your only remedy and our only obligation for modifications to the Customer Guide." (App. 10a.) Reynolds did not make any material changes to the arbitration clause, which would affect this Court from compelling arbitration.[17]

Metro's argument the Customer Guide is not readily accessible because it requires a password and username is unpersuasive. No party disputes Reynolds' availability if Metro experienced issues with the system, and, as set forth above, Joanne Klotz accessed the Reynolds system. Failure to read the document is not a valid defense.[18]

---

[17] Changes to the Customer Guide are denoted by a change in the 'version number' displayed in the bottom of every page. The Customer Guide has remained unchanged since Version 8 was issued in 2009. The Customer Guide has not changed since the operable exhibits were executed on June 11, 2009.

[18] Metro admits not taking steps to review the 'then-current customer guide' as identified in the authorization letter. Further, Metro employee Joanne Klotz accessed information on www.myreyrey.com "usually once per year to access the end of the year information." (App. 109a-110a.)

### B. The factual underpinnings of Metro's claims fall within the scope of the arbitration provision.

Metro argues its claims are "specifically exempt" from the arbitration provision. Without citation to case law, Metro relies on the language of the arbitration clause exempting from arbitration "disputes involving your failure to pay amounts due to us or violation of any proprietary rights of Other Providers or us." (App. 17a). Metro's argument is without merit.

Metro focuses on its claim for specific performance related to its data[19] within Reynolds' sales system at Value Kia, arguing its data comes within the "proprietary rights" language of the exception. In the "Defined Terms" of the Master Agreement, "Other Providers" is defined as "anyone other than us that provides Items of Services to you." (App. 6a). Metro does not explain how it is an "Other Provider" within the meaning of the definition.

A second question is whether this dispute is related directly or indirectly to a defined Order. The Customer Guide contains a "Disputes" provision which states, in part:

> "***Any disputes between us related directly or indirectly to an Order will be settled by binding arbitration*** (except for disputes involving your failure to pay amounts due to us or violation of any proprietary rights of Other Providers of us) under the American Arbitration Association Rules except as specifically stated herein. It does not matter whether the controversy is based on contract, tort, strict liability, or other legal theory. . . . The arbitration will be held in Dayton, Ohio.

(App. 17a) (emphasis added).

---

[19] The Customer Guide provides the data at issue is Metro's property, not Reynolds or an "Other Provider:"

> "Use of Data. Reynolds acknowledges that we will access, copy, or use your Business Data only for those purposes set forth in the Documents, and that any other access or use of your Business Data will require your prior written consent."

(App. 14a). Metro seeks specific performance of the terms of the agreement between the parties to turn over Metro's data.

"Order" is defined as the Master Agreement and/or an Exhibit that has been accepted by us." "Exhibit" is defined as: "any Reynolds exhibit specifying Items and/or Services. The Exhibit becomes part of an Order when it has been signed by us." (App. 5a).

In reviewing the scope of an Arbitration Clause, we examine the facts underpinning the claims and not rely entirely upon the theories alleged in the Complaint. *CardioNet, Inc. v. Cigna Health Corp.,* 751 F. 3d 165, 176 (3d. Cir. 2014). "In examining the factual underpinnings, the crucial issue is whether the facts underlying the parties' dispute relate to the performance of this agreement". *See CardioNet,* 751 F. 3d at 174-75. Here, Metro seeks damages for breach of contract and specific performance for the return of its data. The essential claim is based on the factual underpinnings of Orders placed with Reynolds and the ownership of data as expressly referenced in the Customer Guide: "Use of Business Data. Reynolds acknowledges that your Business Data belongs to you." (App. 14a)  The parties agree any dispute concerning a defined "Order" will be arbitrated.  All of Metro's claims relate to data it provided and alleged overpayments under the Orders it placed with Reynolds. These claims substantially depend upon and relate to Reynolds' performance under their Agreement.

We find the broad language of the arbitration provision, and the definition of "Order" which includes the Master Agreement and "Exhibit" – both of which incorporate the arbitration clause – to include Metro's claim for specific performance and for damages under a breach of contract claim.

## III. Conclusion

Auto dealership Metro negotiated and received computer services under a series of agreements with Reynolds for over twelve years.  As it is entitled, it may transition its

computer services to ADP. Its agreement with Metro, through a variety of incorporated documents under Ohio law, provides for arbitration of any disputes related directly or indirectly to an Order through the American Arbitration Association Rules to be held in Dayton, Ohio, regardless of whether the controversy is based on contract, tort, strict liability or other legal theory. An Order is defined as an exhibit which includes any Reynolds exhibit specifying items or services. Metro's two claims arise from services provided under Orders and it agreed, through the Customer Guide, those claims will be resolved in binding arbitration. In the accompanying Order, we grant Reynolds' Motion to Compel Arbitration under the American Association Rules in Dayton, Ohio.